UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DAPHEDRON LAMAR ALLEN,

                Petitioner,

v.                                      Case No. 3:23-cv-1-JEP-MCR

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

                Respondent.

_____

## ORDER

**THIS CAUSE** is before the Court on Petitioner's counseled Amended Petition for Writ of Habeas Corpus by a Person in State Custody Under 28 U.S.C. § 2254 ("Amended Petition," Doc. 5), Respondent's Response to the Amended Petition (Doc. 12), and Petitioner's Reply (Doc. 16) thereto.[1] Upon review, no evidentiary proceedings are warranted in this Court.[2] For the reasons set forth below, the Amended Petition is denied.

---

[1] For purposes of reference to pleadings and exhibits, the Court will cite the document numbers and page numbers assigned by the Court's electronic docketing system.

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." *Jones v. Sec'y, Fla. Dep't of Corrs.*, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing *Chavez v. Sec'y Fla. Dep't of Corrs.*, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the

## I.    PROCEDURAL HISTORY[3]

On July 25, 2014, the State of Florida filed an indictment in Hamilton County Circuit Court case number 2014-CF-80, charging Daphedron Lamar Allen ("Allen") with first-degree murder of Frank Carl Jones, III ("Jones") (count one), aggravated battery with a deadly weapon on David Washington ("Washington") (count two), and shooting into a vehicle occupied by Louis Ash ("Ash") and Conrad Williams ("Williams") (count three), based on events that occurred on May 18, 2014. (Doc. 12-1). On January 12, 2015, the State filed an amended information in Hamilton County Circuit Court case number 2015-CF-1, charging Allen with third-degree murder of Jones (count one) and possession of a firearm by a convicted felon (count two). (Doc. 12-2). On January 14, 2015, the trial court consolidated all charges in case number 2014-CF-80 with the charge of third-degree murder in case number 2015-CF-1 for

---

petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* The Court finds that "further factual development" is unnecessary. *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

[3] The Court takes judicial notice of Petitioner's state court dockets. *See Paez v. Sec'y, Fla. Dep't of Corrs.*, 947 F.3d 649, 651–52 (11th Cir. 2020) (holding that a district court may take judicial notice of online state court docket sheets in ruling on a petition for writ of habeas corpus).

trial purposes.[4] (Doc. 12-3). On January 15, 2015, the trial court accepted Allen's guilty plea to the consolidated charges. (Doc. 12-4). On January 22, 2015, Allen filed a counseled motion to withdraw the plea, which the trial court granted on January 28, 2015. (Doc. 12-5).

Allen proceeded to trial. On March 18, 2015, the jury found Allen guilty of first-degree murder, aggravated battery with a deadly weapon, and shooting into an occupied vehicle, as charged in the indictment. (Docs. 12-6, 12-7, 12-8). On May 20, 2015, the trial court sentenced him to a term of life imprisonment on count one to run consecutive to the mandatory minimum term of twenty years on count two and the term of fifteen years on count three. (Doc. 12-11 at 15, 18; Doc. 12-12 at 2–13).

On May 22, 2015, the trial court appointed James Janousek, II, Esq. ("Mr. Janousek") to represent Allen in all further proceedings in light of the withdrawal of his trial counsel, David W. Collins, Esq. ("Mr. Collins"), at the sentencing hearing. (Doc. 12-11 at 11–17; Doc. 12-13). Previously, on March 24, 2015, Allen had filed a counseled motion for a new trial. (Doc. 12-10). After holding a hearing on July 15, 2015, the trial court denied the motion and ordered restitution. (Doc. 12-14 at 17–19; Doc. 12-15).

---

[4] It appears that on July 15, 2015, the State filed nolle prosequi as to the charge of possession of a firearm by a convicted felon, which was included in count two of the amended information in case number 2015-CF-1.

Through counsel, Allen appealed his convictions and sentences to Florida's First District Court of Appeal ("First DCA"). (Docs. 12-16, 12-17). The First DCA per curiam affirmed the convictions without a written opinion on January 11, 2017, *see Allen v. State*, 222 So. 3d 1202 (table) (Fla. 1st DCA 2017), and issued the mandate on January 27, 2017. (Doc. 12-18).

On April 11, 2018, Allen filed a counseled motion to vacate or set aside his convictions and sentences pursuant to Florida Rule of Criminal Procedure 3.850 with special request for leave to amend. (Doc. 12-19). On January 29, 2020, the State responded to the Rule 3.850 motion, conceding that an evidentiary hearing was necessary as to grounds one, two, four, five, and six, and arguing for the summary denial of ground three. (Doc. 12-20). After holding an evidentiary hearing on April 27, 2021, and receiving Allen's counseled written closing argument as to grounds two and four, the trial court denied the Rule 3.850 motion on September 1, 2021. (Docs. 12-21, 12-23, 12-24). The First DCA per curiam affirmed the denial without a written opinion on December 16, 2022, *see Allen v. State*, 352 So. 3d 304 (table) (Fla. 1st DCA 2022), and issued the mandate on January 4, 2023. (Docs. 12-26, 12-27, 12-28, 12-29).

Meanwhile, on January 27, 2019, Allen had filed a counseled petition for writ of habeas corpus, alleging ineffective assistance of appellate counsel,

4

which the First DCA "denied on the merits" without a written opinion on October 23, 2019, *see Allen v. State*, 280 So. 3d 557 (Fla. 1st DCA 2019). (Docs. 12-30, 12-31, 12-32, 12-33, 12-34). Through counsel, Allen timely filed his original Petition in this Court on January 2, 2023, and his Amended Petition on March 9, 2023.[5] (Docs. 1, 5).

## II.    LEGAL STANDARD

### A.    AEDPA

Pursuant to the Antiterrorism Effective Death Penalty Act ("AEDPA"), a federal court may not grant federal habeas relief with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

---

[5] Respondent concedes, and this Court finds based on review of the state court dockets, that this action is timely. (Doc. 12 at 37–38).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Sec'y for Dep't of Corrs.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*:

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

244 F.3d 831, 835 (11th Cir. 2001) (quoting *Williams*, 529 U.S. at 412–13). Even if the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable."[6] *Id.* (quotation omitted).

---

[6] In considering the "unreasonable application inquiry," the Court must determine "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Whether a state court's decision was an unreasonable application of law must be assessed in light of the record before the state court. *Holland v. Jackson*, 542 U.S. 649, 652 (2004); *see also Bell v. Cone*, 535 U.S. 685, 697 n.4 (2002) (declining to consider evidence not presented to state court in determining whether the state court's decision was contrary to federal law).

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). However, the state court's "determination of a factual issue . . . shall be presumed correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parker*, 244 F.3d at 835–36.

## B.    Exhaustion and Procedural Default

Before bringing a § 2254 habeas action in federal court, a state prisoner must exhaust all state court remedies that are available for challenging his conviction. *See* 28 U.S.C. § 2254(b)(1)(A). To do so, he must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust their claims, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), thereby alerting the appropriate state court of "the federal nature of the claim[s]," *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). *See also Pope v. Rich*, 358

F.3d 852, 854 (11th Cir. 2004) (noting "that *Boerckel* applies to the state collateral review process as well as the direct appeal process.").

A state prisoner's failure to properly exhaust available state remedies results in a procedural default, which raises a potential bar to federal habeas review. Under the doctrine of procedural default:

> [A] federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 747–748 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 84–85 (1977). A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. *See, e.g.*, *Walker v. Martin*, 562 U.S. 307, 316 (2011); *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. *See Coleman*, 501 U.S. at 750.

*Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012) (internal citations modified).

"To show cause, the petitioner must demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Once cause is established, "the petitioner also must show actual prejudice from the alleged constitutional violation." *Id.* (citing *Sykes*, 433 U.S. at 84). "[I]n order to show prejudice, a

petitioner must demonstrate that 'the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness.'" *Id.* (quoting *McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992)).

In the absence of a showing of cause and prejudice, a petitioner may still receive consideration on the merits of a procedurally defaulted claim if he can show that a fundamental miscarriage of justice would occur:

> "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Carrier*, 477 U.S. at 496. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001).

*Ward*, 592 F.3d at 1157 (internal citations modified). "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." *Johnson*, 256 F.3d at 1171 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. *Schlup*, 513 U.S. at 324.

### C.    Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court of the United States established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense. *Id*. at 687–88. A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. at 689–90. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

As observed by the Eleventh Circuit:

[The test for ineffective assistance of counsel] has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992) (citation omitted).

Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

## III.    DISCUSSION

### A.    Ground One

In Ground One, Allen alleges:

> The trial court's denial of Allen's motion for [a] new trial alleging juror misconduct without allowing Allen to present testimony from the juror, was in error and was contrary to, and an unreasonable application of *Remmer v. United States*, 347 U.S. 227 (1954) and its progeny, resulting in a violation of his right to due process under the Fourteenth Amendment.

(Doc. 5 at 20 (name abbreviated); *see also* Doc. 16 at 2–4).

Allen presented a similar claim in his direct appeal initial brief, but seemingly only in the context of state law. (Doc. 12-16). While Allen included citations to the Fifth and Fourteenth Amendments to the United States Constitution, his arguments were premised entirely on state law and did not reference *Remmer*, its progeny, or any other decision by the United States Supreme Court. (*See id.*). Because Allen did not fairly present this particular claim or the federal nature of the claim on direct appeal, he deprived the state court of a meaningful opportunity to review the claim. *See Baldwin*, 541 U.S.

11

at 29. Since future attempts to exhaust this claim would be futile, the claim is procedurally defaulted. *Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999).

Nevertheless, even assuming the claim had been exhausted, it must still be denied on the merits. In his motion for a new trial, Allen argued that juror Wardell Lofton violated the trial "court's order to not utilize social media and [make] comments about the case after already being picked as a juror." (Doc. 12-10 at 1). Allen attached two screen shots of the juror's Instagram posts. (*Id.* at 2–3). The first one was apparently posted during jury selection and read:

> To[o] bad it[']s illegal to skip out on jury duty [sic] hint[,] hint[,] wink[,] wink . . . .
>
> Chill[,] we [are] on our lunch break[,] we haven[']t even started reviewing the case and they only arrest [people] who pull a no[-]show[,] [you] have [un]til 1[.]

(*Id.* at 3; *see also* Doc. 12-14 at 10). The second one was posted after the trial court instructed the jury but before deliberations began, and included a sketch of a seahorse with a handwritten note, stating: "How do you deal with the guilt of not understanding?" (Doc. 12-10 at 2; *see also* Doc. 12-14 at 10–12).

Mr. Janousek adopted Allen's motion for a new trial filed by Mr. Collins, and subpoenaed the juror to testify at the hearing on the motion. (Doc. 12-14 at 2–4, 11). However, before the hearing started, counsel discussed the matter with the juror, and based on the juror's representations, decided to withdraw the issue. (*Id.*). During the trial court's questioning, Allen opposed his counsel's

12

attempt to withdraw the juror misconduct issue from his motion. (*Id.* at 4–5). Allen believed the juror's posts related to the trial and showed that the juror did not understand the court's instructions. (*Id.* at 12). The prosecutor sided with defense counsel based on his own conversation with the juror, and argued "there was no misconduct." (*Id.* at 6). The prosecutor explained, in part:

> [A]t best[,] what we have is a juror stating that he was in a jury trial. He didn't say what jury trial it was, he didn't say when it was, where it was, he didn't say anything about the evidence or the facts of the case.
>
> Pretty much all he broadcasted out was he was a juror in a case, which jurors are allowed to say.

(*Id.*).

The trial court rejected counsel's attempt to withdraw the issue and, instead, considered the motion on the merits, which led to the following exchange:

> THE COURT: . . . Mr. Allen, if you wish to make any comment or provide any evidence with respect to that, would you raise your right hand?
>
> *(Whereupon the defendant was sworn by the Court.)*
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: All right. I've heard what [prosecutor John] Weed has to say about that, the Court is familiar with this area of the law and specifically the instructions that a court gives to potential jurors about the use of electronic media, social media, et cetera. And it's not a prohibition on any use whatsoever, but only certain types of use.

And one of the specific things the Court tells [jurors is] that [they] are authorized to use text messaging, twittering, tweeting, emails, or telephone to let people know about [their] schedule . . . . Those things are permitted[,] and to the extent that the comment made by the juror is limited to what Mr. Weed and Mr. Janousek have represented, then I'm going to take that into consideration . . . .

THE DEFENDANT: And how did he deal with the guilt of making a decision that send [sic] me away for the rest of my life, and he ain't [sic] really understanding what's going on.

THE COURT: Now was this juror asked specifically about that?

MR. JANOUSEK: No, sir. . . . [I]f he had issues with the jury instructions, that would have been something that was brought up during the trial[.]

THE DEFENDANT: Man, this is b***s***.

THE COURT: . . . . But the case law as I understand it is, . . . if there's any question . . . as part of the instructions, they can write it down, submit it to the bailiff and the bailiff gives it to me. And then in consultation with the attorneys I say, Here's the question, [W]hat do we tell the jurors? And sometimes we just tell them, you know, You're just going to have to rely on the instructions we gave you. . . . But it's a huge leap to go from this (indicating) to he didn't understand the instructions.

MR. JANOUSEK: And specifically, the juror . . . this morning did say that this had nothing to do with the trial.

THE COURT: . . . So if it had nothing to do with the trial, then . . . that's the beginning and end of our analysis. . . . [N]othing has been presented this morning [that] indicates to me that there's any basis for jury misconduct, that . . . he was not honest or candid in the questions he answered on voir dire, or that he did anything contrary to the Court's instructions during the course of trial before he was released from the Court's prohibitions. And his own statements[,] which have been confirmed by counsel for the

> Defense and counsel for the State[,] [are] that none of these things
> had anything to do with the trial.

(*Id.* at 9–10, 13–15). The trial court then denied Allen's motion for a new trial.
(*Id.* at 17–18; Doc. 12-15).

In his direct appeal initial brief, Allen argued there was "a factual dispute regarding the juror's intent and meaning." (Doc. 12-16 at 18, 21). According to Allen, "[t]he meaning and import of the juror's comment could only be resolved with testimony from the juror" and "[t]he court's reliance on counsel's representations to make findings of fact regarding the juror's conduct was not proper." (*Id.* at 22). In the Answer brief, the State argued as follows:

> This issue was not preserved for appellate review and even waived because the trial court specifically asked [Allen] if he wanted to present any evidence and [Allen] never indicated that he wanted the juror to testify in the hearing. Also, [Allen] never indicated that he disputed the assertion by defense counsel that the juror informed him that his conduct/statements were not related to the trial. When the trial court stated that it was relying on the assertions by defense counsel as to what the juror said as part of the reason it was denying the motion, [Allen] responded, "all right."
>
> In any event, . . . [Allen's] attorney and the prosecutor both indicated that they had spoken to the juror that morning and that the juror stated that his conduct or statements had nothing to do with [Allen's] case. There was no factual dispute regarding what the juror said as [Allen] never challenged the assertions by the attorneys that the juror made these statements to them. [Allen] simply argued that the trial court should disbelieve what the juror said and extrapolate that the juror did not understand the jury instructions. In addition, it should be noted that case law reflects

that a juror misunderstanding the jury instructions is a matter
that inheres in the verdict.

(Doc. 12-17 at 8). The First DCA per curiam affirmed the denial of Allen's

motion for a new trial without a written opinion. (Doc. 12-18).

The Court finds that Allen has not established a viable constitutional

claim on the juror misconduct issue. As the State argued, this issue was not

properly preserved for appeal, and even if it was, there was no factual dispute

necessitating the juror's testimony. Indeed, both the content of the juror's posts

and the attorneys' representations as to what the juror told them support the

trial court's ruling that there was no misconduct. In addition, the cases on

which Allen relies are distinguishable and do not compel a different result. For

example, *Remmer* involved correspondence *to* a juror in an income tax evasion

case, and in any event, what *Remmer* required was a hearing on defendant's

motion for a new trial, which Allen has already received. *Remmer*, 347 U.S. at

228–30 (remanding for a hearing on defendant's motion for a new trial where

defendant and his counsel learned for the first time from the newspapers after

the jury verdict that during the trial an unnamed person had communicated

with a juror, who ultimately became the foreman, and told the juror he could

profit by bringing in a verdict favorable to defendant; the juror reported the

incident to the judge who in turn reported it to the prosecutors, leading to an

investigation and a report by the Federal Bureau of Investigation, which the

16

judge and the prosecutors considered, but "concluded that the statement to the juror was made in jest, and nothing further was done or said about the matter"). Accordingly, Ground One is denied.

**B.    Ground Two**

In Ground Two, Allen alleges his appellate counsel was ineffective for failing to argue that the trial court should have conducted an inquiry under *Faretta v. California*, 422 U.S. 806 (1975), when Allen purportedly undertook his own representation during two critical points in the case. (Doc. 5 at 28–36; *see also* Doc. 16 at 4–6). The first point was just prior to sentencing when Allen addressed the court about a gunshot residue report that was not presented at trial because of a deal his counsel made with the State. (Doc. 5 at 28–31, 33–36). The second point was during the hearing on restitution and Allen's motion for a new trial. (*Id.* at 32–36).

Allen raised this claim in his petition for writ of habeas corpus filed in the First DCA. (*See* Doc. 12-30). The State filed a response to the petition, and Allen filed a reply. (Docs. 12-32, 12-33). The First DCA per curiam denied the petition "on the merits" without a written opinion. (Doc. 12-34). Conceding exhaustion, Respondent argues, and the Court agrees, that this claim is built on a faulty premise, namely, that Allen was representing himself at the two hearings. (*See* Doc. 12 at 57). The transcripts of the hearings do not show that

17

Allen was forced to represent himself or that he unequivocally requested to

represent himself, to discharge counsel, or to appoint new counsel. (*See* Docs.

12-11, 12-14).

At the outset of the sentencing hearing, Allen requested to address the

court (Doc. 12-11 at 2–3), and the following exchange took place:

> THE DEFENDANT: Okay. I have evidence that . . . was being
> withheld from me until last week that clearly indicates my
> innocence. Him and him made a deal behind my back not to bring
> this up at trial, forensic evidence that say[s], The individual did
> not discharge a firearm, the individual was not in close proximity
> to a firearm. This was sent to division of science, they tested my
> clothes, my hands and they came back negative. He didn't bring it
> up at trial. He said they made a deal behind my back not to bring
> this up at trial. I [was] found guilty of discharging a firearm on
> every charge and science don't [sic] lie. He had --
>
> THE COURT: Well, let me --
>
> THE DEFENDANT: -- witnesses that lied --
>
> THE COURT: -- let me stop you --
>
> THE DEFENDANT: -- but science don't [sic] lie.
>
> THE COURT: -- just for a second. Let me stop you just for a second.
> None of those matters are in evidence, none of those matters are
> sworn to, or before the Court. And procedurally, there's a way to
> bring those up by way of post-trial motions and other vehicles for
> obtaining relief. I don't believe . . . this would be the appropriate
> time . . . or opportunity to do that. . . . [Y]ou're asking me to
> conduct, reopen pretrial discovery and a trial. . . . When we've
> already conducted those matters. . . . .
>
> THE COURT: Mr. Weed?
> . . . .

MR. WEED: Analysis showed there was gunshot residue on the defendant's shorts.[7] . . . .

THE COURT: The Court is not going to address that at this time. There is a time and place when the Court will address that and the Court will give it it's proper consideration. . . .

THE DEFENDANT: Yes, sir.

THE COURT: I'm ordering you to remain silent until you're requested to address the Court and respond to any particular questions. The Court is not going to deal with this matter or the information you're providing at this hearing. The Court will, when you file a proper motion and . . . we've noticed it, we will come back and we will address that as the rules of criminal procedure require us to. But I'm not going to do it today and I don't want you to say anything further about that today. All right. Now, are we ready to proceed with sentencing?

MR. WEED: Yes, Your Honor.

(*Id.* at 4–8).

At that point, the State called its sole witness and presented its sentencing recommendation to the court. (*Id.* at 8–11). When the court was about to turn the matter to defense counsel, the following exchange took place:

---

[7] At the evidentiary hearing on Allen's Rule 3.850 motion, the prosecutor, Mr. Weed, explained that he considered introducing the gunshot residue report, but decided against it because the results were a "mixed bag": there was some gunshot residue on Allen's clothes, but not on his hands, which could be easily explained by the lapse of at least twelve hours between the shooting and the examination. (Doc. 12-21 at 44–47). Mr. Weed offered Mr. Collins that he would not introduce the report if Mr. Collins agreed not to argue that there was no gunshot residue test. (*Id.* at 47). Mr. Collins agreed not to bring it up so he would "not have . . . one more thing to have to explain." (*Id.*).

19

MR. COLLINS: Your Honor, I'm sort of in a quandary after Mr. Allen's allegations.

THE DEFENDANT: I don't want him to say nothing.

MR. COLLINS: That's fine.

THE DEFENDANT: I don't want him to say nothing.

THE COURT: Does . . . the defendant wish to present any information, other than the things you mentioned? . . . .

THE DEFENDANT: -- I want to say something to --

THE COURT: But is there any family member that you want to speak on your behalf?

THE DEFENDANT: Okay. I got this. Ms. Teen (phonetic), I'm sorry for your loss and my heart goes out to you and your family. Maestro didn't deserve to die like that. And I want to let you know, like I said from day one, I didn't do this, I'm innocent. And I just received this paperwork from forensic scientists that my lawyer -- they kept away from me, the family, the jury. Evidence that would have freed me, because I got tested. . . . . This was never about justice, it was all about a conviction by any means necessary. That's wrong and now I'm about to be taken away from my family, my four kids, twins that I have spent one night with on the streets. So now my family's fixing to have to spend more money to fix this problem that should have never happened, I should be home with my kids. But yet[,] I'm facing life in prison because my lawyer and the State made a deal behind my back not to bring up evidence that could have proven my innocence, and this came straight out of his mouth, [be]cause one thing about it, people lie, but science doesn't and the evidence clearly say[s] I'm innocent. And once again, I'm sorry y'all had to go through this. And I truly believe that Maestro's in a better place.

(*Id.* at 11–12).

The court then addressed counsel about the sentencing recommendation. (*Id.* at 13). Counsel for both sides confirmed that on count one, Allen was facing a statutorily mandated life sentence. (*Id.*). As to counts two and three, counsel agreed that the State's scoresheet "appear[ed] to be in order." (*Id.* at 13–14). The court then turned to the issue of restitution:

> THE COURT: . . . Mr. Allen, the $5,495 in restitution, you have the right to stipulate and agree to that, or you have a right to challenge that and the State would be required within 60 days to conduct an evidentiary hearing to establish that amount.
>
> THE DEFENDANT: I challenge it.
>
> THE COURT: Mr. Collins, you're still Mr. Allen's lawyer.
>
> MR. COLLINS: Yes, if Mr. Allen wishes to challenge it[,] I believe that's his right.
>
> THE COURT: All right. . . . I'm going to assume he wants to challenge that, we'll schedule an evidentiary hearing.

(*Id.* at 14–15). At that point, the court imposed the sentence and noted that restitution would be addressed within sixty days. (*Id.* at 15, 18). The court reiterated that the matters Allen had raised earlier at the hearing appeared to involve allegations of ineffective assistance of counsel and would be addressed at the appropriate time. (*Id.* at 15). Then, the following exchange took place:

> THE COURT: . . . The Court would consider and act upon today's hearing an ore tenus motion to withdraw an appointment of counsel to represent Mr. Allen[,] if that is something you're going to be doing, Mr. Collins. Or whether you wish to have the opportunity to confer first with Mr. Allen before you take any

specific action. But[,] obviously[,] I think Mr. Allen needs to make sure, and the Court needs to make sure[,] Mr. Allen has counsel going forward that is not in a tenuous position.

MR. COLLINS: Yes, Your Honor, I think given Mr. Allen's allegations, I would make the ore tenus motion so that there would not be a continuing conflict. I also need to make sure he understands with a motion to withdraw at this time that successive counsel, whom the Court would appoint, needs to file the proper appellate paperwork also. So I would [sic] that that motion be granted.

THE COURT: All right. Your motion to withdraw . . . is granted.

(*Id.* at 15–16).

Considering the above-cited records, the Court finds that at no point during the sentencing hearing did Allen make an unequivocal request to discharge counsel followed by an unequivocal request to represent himself to trigger the trial court's obligation to conduct a *Faretta* inquiry. *See Ault v. State*, 53 So. 3d 175, 205 (Fla. 2010) ("*Faretta* inquiries are required where a defendant has made an unequivocal request for self-representation."); *Watts v. State*, 593 So. 2d 198, 203 (Fla. 1992) (finding that "because there was no unequivocal request for self-representation, [defendant] was not entitled to an inquiry on the subject of self-representation under *Faretta*"), *cert. denied*, 505 U.S. 1210 (1992); *Boyd v. State*, 45 So. 3d 557, 558–59 (Fla. 4th DCA 2010) (concluding that because defendant did not assert a right of self-representation, the trial court was not required to determine whether he

knowingly rejected the right to counsel; and finding that just because defendant insisted on his right to a speedy trial, which was contrary to his counsel's request for a continuance, defendant was not engaging in self-representation and no *Faretta* inquiry was required); *Brooks v. State*, 703 So. 2d 504, 506 (Fla. 1st DCA 1997)[8] (stating that no *Faretta* warnings are "required in the absence of an unequivocal request for self-representation").

Even if Allen's request to address the court about the gunshot residue report, his intent to prevent counsel from speaking on mitigation, and his repeated claims of innocence could be interpreted as ambiguous requests for self-representation, the trial court was not required to conduct a *Faretta* inquiry in the face of such ambiguous requests. *See Davis v. State*, 136 So. 3d 1169, 1209 (Fla. 2014); *McCray v. State*, 71 So. 3d 848, 865–66 (Fla. 2011) (concluding that where defendant "vacillated between his decision to discharge counsel and to have counsel's assistance" in trying the case, the court was not required to hold a *Faretta* hearing because defendant's requests "were not

---

[8] Unlike the cases on which Allen relies, Allen was never designated as co-counsel and there was no hybrid representation in place. *See, e.g.*, *Brooks*, 703 So. 2d at 506–07 (remanding for a new trial for failure to give *Faretta* warnings where the trial court allowed defendant to proceed as co-counsel, which included filing pretrial motions and giving an opening statement at his trial); *Madison v. State*, 948 So. 2d 975, 976 (Fla. 1st DCA 2007) (remanding for a new trial where the trial court designated defendant as co-counsel, but did not conduct a *Faretta* inquiry or advise him of the dangers of self-representation before allowing him to argue pretrial and posttrial motions).

unequivocal, but ambiguous"). As such, appellate counsel was not ineffective for failing to argue a non-meritorious issue. *See Pinkney v. Sec'y, Dep't of Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief."); *Diaz v. Sec'y for Dep't of Corrs.*, 402 F.3d 1136, 1142 (11th Cir. 2005) (holding that counsel was not ineffective for failure to raise a meritless argument); *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) (noting that "it is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.").

Even more tenuous is Allen's claim that appellate counsel was ineffective for failing to argue the same issue regarding the hearing on his motion for a new trial. (Doc. 5 at 32–36). As explained in Ground One, Allen's newly appointed counsel adopted his previously filed motion for a new trial but sought to withdraw the juror misconduct issue after questioning the juror before the hearing. (Doc. 12-14 at 2–4, 11). Allen informed the court that he opposed the attempted withdrawal of the juror misconduct issue. (*Id.* at 4–5). After giving the parties an opportunity to address the merits of the juror misconduct issue, the trial court denied the motion for a new trial. (*Id.* at 17–18; Doc. 12-15). In doing so, the court allowed Allen an opportunity to "comment or provide any evidence" to the court. (Doc. 12-14 at 9). Allen was

sworn and expressed his concerns about the juror's social media posts, but he

never made an unequivocal request to discharge counsel or represent himself.

(*Id.* at 9–13). Under those circumstances, the trial court was not required to

hold a *Faretta* hearing. As such, appellate counsel was not ineffective for failing

to raise a futile issue. Therefore, Ground Two is denied.

### C.    Ground Three

In Ground Three, Allen alleges his trial counsel, Mr. Collins, was

deficient for failing to call Jasmine Hankerson as a trial witness to impeach

Washington, who identified Allen as the shooter, thereby prejudicing the

outcome of the trial. (Doc. 5 at 37–44; *see also* Doc. 16 at 6–9).

Allen raised this claim in ground one of his Rule 3.850 motion. (Doc. 12-

19 at 3–4, 7–8; *see also* Doc. 12-23 at 14, 17). The trial court held an evidentiary

hearing, summarized Ms. Hankerson's testimony, and denied the claim as

follows:

> Ms. Hankerson, in relevant part, testified that she drove
> Washington to the victim's home so that he could visit with the
> victim and [Brent] Sowell. The victim [Jones], Washington, Sowell,
> and Ms. Hankerson were initially the only persons present. When
> the shooting occurred, it was dark outside. Ms. Hankerson was
> sitting in her car and Washington was standing in the road
> speaking to someone in a white truck to the right of Ms.
> Hankerson's car. It sounded like the shots were coming from the
> right of her car. Washington was standing approximately 15 feet
> closer to the shooter than Ms. Hankerson, and his view of the
> shooting was different from hers. Ms. Hankerson could not see
> where the shots were coming from, she could not see anyone

shooting, she did not remember how many shots were fired, and she did not know how many shooters there were or whether she heard one gun or two. The shooter may have been [Allen], but it might not have been.

Ms. Hankerson did not hear Washington or anyone else say anything during the shooting or about the shooting. She only heard "a lot of commotion, crying [and stuff like that]." She knew Washington was shot during [the] incident because he said: "I'm shot." Washington never told her anything regarding the identity of the shooter.
. . . .

Upon consideration of Ms. Hankerson's testimony, this Court finds her testimony would not have supported the defense theory that [Allen] was not present during the shooting, nor would it have cast doubt on [Allen's] guilt. Essentially, her testimony was that she did not see the shooter, and the shooter could have been [Allen] but might not have been. Nor would her testimony have cast doubt on Washington's identification testimony. She acknowledged she was sitting in her car when the shooting began, and that Washington was standing in the street, approximately 15 feet closer to the shooter than she was and had a different view than she did.

. . . . Accordingly, counsel's performance was not deficient in failing to call Ms. Hankerson . . . as [a] trial witness[].

(Doc. 12-24 at 2 (record citations omitted; names abbreviated)). The First DCA per curiam affirmed the denial of the claim without a written opinion. (Doc. 12-29).

Because the First DCA affirmed without a written opinion, the Court presumes the affirmance was based on the trial court's findings. *See Wilson v. Sellers*, 584 U.S. 122, 125–26 (2018) (holding that where the relevant state court decision on the merits does not provide any rationale for its decision, "the

26

federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "should then presume that the unexplained decision adopted the same reasoning"). As the trial court decided the claim on the merits, the Court addresses it in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court concludes that the state court's adjudication of the claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. (*See, e.g.*, Doc. 12-21 at 125–35).

Also, Mr. Collins testified at the evidentiary hearing on Allen's Rule 3.850 motion that he would have called Ms. Hankerson to testify at the trial if she had identified the shooter as someone other than Allen. (*Id.* at 116). Because she did not, her testimony would not have been helpful to the defense, particularly in casting doubt on Washington's identification testimony.[9]

---

[9] Allen urges that because Ms. Hankerson would have testified that she did not hear Washington or anyone else say anything during the shooting or about the shooting, her testimony would have helped impeach Washington who testified that he "hollered" at the shooter and yelled, "he's shooting, he's shooting." (Doc. 5 at 38; *see also* Doc. 12-6 at 93). However, the question of whether Washington said anything during the shooting was a collateral matter that would have been considered along

Therefore, defense counsel was not deficient for failing to call Ms. Hankerson as a trial witness. Ground Three is denied.

### D.    Ground Four

In Ground Four, Allen alleges his trial counsel was deficient for: (a) failing to depose Washington and impeach him with his prior inconsistent statement to Mr. Weed, and (b) failing to present Mr. Weed as a rebuttal witness, thereby prejudicing the outcome of his trial. (Doc. 5 at 45–50; *see also* Doc. 16 at 9–16).

Allen raised this claim in ground four of his Rule 3.850 motion. (Doc. 12-19 at 18–22; *see also* Doc. 12-23 at 7–17). The trial court addressed the claim as follows:

> ### [Allen's] Allegations – Ground Four
>
> [Allen] asserts counsel was ineffective for (a) failing to depose and later impeach Washington at trial and (b) failing to call prosecutor Weed as a rebuttal witness.

---

with Ms. Hankerson's testimony that she heard "a lot of commotion, crying [and stuff like that]." (Doc. 12-24 at 2).

Further, Allen believes the trial court failed to consider Ms. Hankerson's testimony that Washington failed to identify Allen, or anyone else, as the shooter. (Doc. 5 at 41). However, the trial court specifically noted that "Washington never told [Ms. Hankerson] anything regarding the identity of the shooter." (Doc. 12-24 at 2). Also, as discussed in Ground Four, the trial court found that Allen essentially waived his claim of ineffective assistance of trial counsel as to certain issues by failing to question counsel at the evidentiary hearing on those issues, including why Washington did not tell the people who were present at the shooting that Allen was the shooter. (*Id.* at 10).

In Ground Four (a)[,] [Allen] asserts that, prior to trial, counsel knew Washington would testify that he believed [Allen] was the shooter. Despite this knowledge, counsel did not depose Washington, and was unaware that Washington would testify that he saw [Allen's] face at the time of the shooting. [Allen] asserts counsel failed to question Washington about, *inter alia*, his motivation in coming forward months after his initial statement to [the] police that did not mention the shooter's identity; his bias against [Allen]; his relationship with the State; whether the State provided him with free transportation, food, travel expenses or other favors; why he didn't tell his friends who were present during the shooting that [Allen] was the shooter; inquire about his prior statement to Mr. Weed that he could not see the shooter's face because it was dark outside; and impeach him with a 2004 felony conviction.

In Ground Four (b), [Allen] asserts that on January 13, 2015, Mr. Weed e-mailed counsel to inform him that Washington told Mr. Weed that "it was dark, and he could not see [Allen's] face," but he "was still able to recognize the person based on their shape, build, etc." [Allen] asserts that had counsel questioned Washington regarding why he could identify [Allen's] face at trial, when he told Mr. Weed that he could not see [Allen's] face because it was dark, counsel could have called Mr. Weed as a rebuttal witness. [Allen] asserts that had counsel confronted Washington with the inconsistency between his prior statements and his trial testimony and called Mr. Weed as a rebuttal witness, it would have cast doubt on Washington's credibility, and there is a reasonable probability the outcome of the trial would have been different.

## Trial Counsel's Testimony

Counsel, in relevant part, testified that based on the email sent by Mr. Weed, counsel believed Washington would testify that someone who resembled [Allen] was the shooter, but he could not identify the shooter's face. Counsel considered filing a motion in limine because that evidence would be vague. However, he knew the motion would not exclude that evidence because vagueness went to the weight of the evidence, not its admissibility. Based on Mr. Weed's email regarding his understanding of the substance of

Washington's testimony and Washington's vague identification of
[Allen], counsel did not believe a deposition would be helpful.
Counsel understood Washington could not identify [Allen] as the
shooter; only that the shooter was someone who looked like him.
Additionally, Washington had not identified [Allen] in any other
discovery statement. Washington's current statement did not
really identify [Allen], and counsel was concerned that, if he
deposed Washington, either he or the State might refresh his
recollection and elicit more specific identifying information
favorable to the State.

Counsel was surprised by Washington's testimony that he saw
[Allen's] face. However, counsel would not call Mr. Weed as a
rebuttal witness because the probability was that Mr. Weed would
testify that Washington's testimony had surprised him too.
Counsel testified he had no proof, other than Mr. Weed's e-mail,
that Mr. Weed knew what Washington's testimony would be. Mr.
Weed's email indicated Washington would identify [Allen] in
everything but name, but at trial, he identified him by name.
Counsel could not attribute that change in testimony to Mr. Weed.
Counsel did not impeach Washington with Mr. Weed's e-mail,
because the e-mail was written by Mr. Weed, and he could not
impeach Washington with something said by Mr. Weed. Counsel
testified he would have the same problem had he tried to call Mr.
Weed. Counsel testified that, by calling Mr. Weed, counsel would
be alleging Mr. Weed was suborning perjury, and he could not
make that accusation unless he had "heavy, irrefutable,
[ir]rebuttable evidence." Counsel had no evidence that Mr. Weed
had anything to do with Washington remembering at trial that
[Allen] was the shooter.

Counsel testified that had he called Mr. Weed in rebuttal, Mr.
Weed would be testifying to self-serving hearsay, and there was no
hearsay exception. Mr. Weed's testimony would not have been good
for the defense. Mr. Weed would likely have testified "that's what
Washington told me at the time," that he gave counsel the
information regarding Washington's testimony as a courtesy, and
counsel could have deposed Washington. That scenario would
make counsel look bad and indirectly bolster Washington's
credibility. Calling Mr. Weed would likely result in a mistrial, and

30

give Mr. Weed the opportunity to explain the e-mail and why it was sent, and counsel would not have achieved anything of evidentiary value.

## Mr. Weed's Testimony

Mr. Weed testified he did not expect Washington to testify that he could identify [Allen] as the shooter. In his prior conversations with Washington, Washington kept saying he could identify [Allen], but when Washington testified at trial, Mr. Weed realized he had "totally misunderstood him."

Mr. Weed testified the report prepared by Investigator Williams documenting Washington's interview with law enforcement did not mention that Washington could identify the shooter. Similarly, the sworn statement Washington prepared for law enforcement did not indicate he could identify [Allen]. The first time Mr. Weed became aware that Washington would testify that he could see [Allen's] face was when Washington gave that testimony at trial. Washington always stated he could identify [Allen], but Mr. Weed had misunderstood what Washington was telling him. Mr. Weed testified he sent trial counsel the following e-mail on January 13, 2015, prior to trial:

> *David, I just spoke to Washington. He was one of the persons in the yard. He was the one shot in the leg. He says he saw the person in the bushes that shot Jones. He says it was dark and he could not see his face, however, he says that he was still able to recognize the person based on their shape, build, et cetera. He says it looked to him to be Allen.*
>
> *Apparently, there was no recorded interview of Washington since he was taken to the hospital after the shooting. He was briefly interviewed at the hospital, but not an extensive interview. That is why none of this was in the reports. No one has talked to him since, so I had no idea he saw anyone in the bushes until I talked to him today. He provided a written statement, but it was vague, though implies he did not see something.*

31

> *I've always believed that no one saw anything from the*
> *bushes, and I have represented that to you, but*
> *Washington will state that the person he saw in the*
> *bushes he recognized as Allen or looked like Allen.*

Mr. Weed believed Washington was telling him he could not see
[Allen's] face and could only identify [Allen] by body-type. At trial,
Mr. Weed realized Washington had been saying he could not see
[Allen] when he was in the bushes, but he saw [Allen's] face when
he stepped out of the bushes. Washington kept saying he could see
[Allen], but when Mr. Weed asked if Washington could see [Allen]
in the bushes, Washington said no. Mr. Weed agreed the
information he conveyed to counsel regarding Mr. Weed's
understanding of what Washington's testimony would be was
materially different from what Washington's testimony was, but
Mr. Weed had misunderstood what Washington had been telling
him.

Washington had been difficult to contact, and the State had been
prepared to go to trial without his testimony. The evidence against
[Allen] was that earlier that day, while in a public place, he had
been slapped in the face by Williams. Later that day, Williams was
in a white truck parked in front of the victim's home when the
shooting occurred; most of the bullets hit the white truck. Lawanda
Williams[10] saw a man with [Allen's] build, wearing bright red
shorts and a flag shirt, running across the street. [Allen] was
wearing bright red shorts and a flag shirt on the night of the
shooting. Malik Clay was in his home when [Allen] "barged" in
with a gun and tried to give the gun to Clay. Clay lived
approximately 100 yards from where the shooting occurred. [Allen]
appeared very nervous and scared. Clay thought he was on drugs
because he was acting so erratically. [Allen] asked to use Clay's

---

10 According to the trial transcript, Ms. Lawanda *Owens* testified that as she
was driving in the area on the night of the incident, "somebody just ran across [her]
car," and she almost "hit him." (Doc. 12-6 at 128–29). She could not see who the person
was, but remembered he was wearing "red shorts." (*Id.* at 129, 133–34). The trial
court's recitation of the rest of the evidence is consistent with the trial transcript. (*See*
Docs. 12-6, 12-7, 12-8).

phone and called Sipp Pierce, trying to get a ride. [Allen] told Clay
to say [Allen] had not been there if anyone asked. The rest of the
evidence was [Allen] "bouncing around town," trying to get a ride.
All of this occurred immediately after the shooting. [Allen] gave
alibis, each of whom testified he was not with them. This evidence
was independent of that provided by Washington.

## Analysis – Ground Four

The evidence establishes Washington's trial testimony was
substantially different from anything he previously reported. His
written statement, given while being treated at the hospital
immediately after the shooting, did not indicate he could identify
the shooter. The report documenting law enforcement's interview
of Washington did not indicate he could identify [Allen] as the
shooter. The e-mail Mr. Weed sent counsel following Mr. Weed's
conversation with Washington indicated Washington did not see
the shooter's face because it was dark, but he could identify [Allen]
as the shooter by shape and size. Based on Washington's prior
statements and counsel's experience with Mr. Weed, counsel had
no reason to doubt the accuracy of Mr. Weed's representation and
no reason to believe Washington would identify [Allen] other than
a vague identification of shape and build in the dark. Counsel did
not depose Washington because, based on Washington's prior
statements, he believed he knew the substance of Washington's
testimony, and he did not want to refresh his recollection to enable
him to identify [Allen] more accurately. When considering the
evidence available to counsel at the time of the trial, this Court
finds the decision not to depose Washington was reasonable trial
strategy.

Similarly, this Court finds counsel's reasons for not calling Mr.
Weed as a rebuttal witness was reasonable trial strategy. Had Mr.
Weed testified, his anticipated testimony was that he was also
surprised by Washington's testimony. Notably, Mr. Weed testified
to this effect at the evidentiary hearing. Mr. Weed's testimony
during the evidentiary hearing established he would also have
testified that he had misunderstood what Washington was telling
him. Counsel had no evidence to rebut Mr. Weed's testimony.
Moreover, counsel thoroughly cross-examined Washington

33

regarding his prior written and oral statements to law enforcement, and Washington testified that, although he did not include in his written statement that he saw [Allen's] face, he gave that information to law enforcement when he was initially interviewed. When considering trial counsel's accurate evaluation of Mr. Weed's anticipated testimony, in conjunction with Washington's testimony that he did tell law enforcement that he saw [Allen's] face, this Court finds Mr. Weed's testimony would not have assisted the defense, and counsel correctly concluded he would have obtained nothing of evidentiary value had he called Mr. Weed as a rebuttal witness.

Although in hindsight, counsel's strategy may not have worked to [Allen's] ultimate advantage, this Court finds counsel's decisions not to depose Washington or call Mr. Weed as a rebuttal witness were reasonable from counsel's perspective at the time the decisions were made. . . .

While [Allen's] current counsel may have proceeded differently, trial counsel is not ineffective merely because current counsel disagrees with trial counsel's strategic decisions. . . . Accordingly counsel's decision not to depose Washington or call Mr. Weed as a rebuttal witness did not constitute deficient performance.

[Allen's] argument that counsel's performance was deficient for failing to question Washington regarding his identification of [Allen] at trial for the first time, is refuted by the record. During trial, counsel questioned Washington regarding why his testimony at trial was "nothing like the version" he gave "in detail in writing back in May," and why he did not include in his written statement that [Allen] [w]as the shooter. Washington testified he told Officer Brownfield that he could see [Allen's] face, and he did not include that information in his written statement because "maybe I was on morphine, you know, trying to see about my leg." Counsel also questioned how Washington could see [Allen] in the dark and in the bushes. Washington testified there were two lights nearby, which lit the area near the bushes where the shooting occurred.

[Allen] failed to question counsel regarding his reasons for not impeaching Washington with a 2004 felony conviction, and for not

questioning Washington regarding any bias he had against [Allen], his relationship with the State, whether the State provided him with food, transportation, and travel expenses, and why he didn't tell his friends who were present at the shooting that [Allen] was the shooter. [Allen] has the burden to prove his claim of ineffective assistance of counsel at an evidentiary hearing. . . . By failing to question counsel regarding these issues, [Allen] failed to establish counsel's performance was deficient as it relates to these issues, or that there is a reasonable probability the outcome of the trial would have been different had counsel made these inquiries. For each of the foregoing reasons, [Allen] is not entitled to relief on Ground Four.

(Doc. 12-24 at 5–10 (record citations omitted; names abbreviated; emphasis added)). The First DCA per curiam affirmed the denial of the claim without a written opinion. (Doc. 12-29).

Because the First DCA affirmed without a written opinion, the Court presumes the affirmance was based on the trial court's findings. *See Wilson*, 584 U.S. at 125–26. As the trial court decided the claim on the merits, the Court addresses it in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court concludes that the state court's adjudication of the claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence

35

presented.[11] (*See, e.g.*, Doc. 12-21 at 10–12, 14–16, 22–30, 51–55, 84–88, 90–92, 95, 107, 110, 113).

Allen argues the trial court's adjudication of the claim was based on an unreasonable determination of the facts presented at the evidentiary hearing, because trial counsel never considered whether to impeach Washington with his prior inconsistent statement to Mr. Weed or to present Mr. Weed as a rebuttal witness, suggesting that counsel's failure to do so cannot be considered strategic. (Doc. 5 at 47–48). However, when viewed in proper context, the testimony at the evidentiary hearing supports the trial court's determination that Mr. Collins acted strategically when he did not depose Washington or impeach him with his prior inconsistent statement included in Mr. Weed's email, and when he did not call Mr. Weed as a rebuttal witness. As the trial court found, such strategic decisions cannot form the basis of an ineffective assistance of counsel claim. *See, e.g.*, *Durousseau v. State*, 218 So. 3d 405, 410 (Fla. 2017) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct

---

[11] In reaching this conclusion, the Court gives heightened deference to the state court's credibility determinations on habeas review. *See Gore v. Sec'y, Dept' of Corrs.*, 492 F.3d 1273, 1300 (11th Cir. 2007) ("A certain amount of deference is always given to a trial court's credibility determinations. That the case is before us on habeas review heightens that deference." (internal citations omitted)).

the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (citing *Strickland*, 466 U.S. at 689)); *Buzia v. State*, 82 So. 3d 784, 795 (Fla. 2011) ("[A]n attorney is not ineffective for decisions that are a part of a trial strategy that, in hindsight, did not work out to the defendant's advantage." (quoting *Mansfield v. State*, 911 So. 2d 1160, 1174 (Fla. 2005))); *Jeantilus v. State*, 944 So. 2d 500, 501 (Fla. 4th DCA 2006) ("Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct" (quoting *Brown v. State*, 894 So. 2d 137, 147 (Fla. 2004))).

Mr. Collins testified that although he considered taking Washington's deposition after he received Mr. Weed's email, he ultimately decided against it. (Doc. 12-21 at 85). He explained that "in [his] experience, those kind[s] of depos[itions] on [identification were] not going to help, because Mr. Weed already told [him] what [Washington was] going to say and [he] trust[ed] Mr. Weed." (*Id.*). Additionally, taking the deposition would have given Mr. Weed a chance to "refresh [Washington's] recollection on something else, and the next thing you know [Washington would] be pointing [at his] client." (*Id.*). Mr. Collins explained that "deciding who to depose and who not to depose" was "definitely a strategic decision" that was his to make. (*Id.* at 107). And based

37

on the evidence he had at the time, he decided "there was no point in taking
Washington's deposition." (*Id.* at 110). But even assuming he had deposed
Washington and had become "aware at that deposition that Washington could
identify Allen by face," "it wouldn't have changed a lot." (*Id.* at 113 (names
abbreviated)). With that information, he might have been able to impeach
Washington "to a point," and he would have told his client "to more seriously
consider any plea offers," but he did not "think Washington would have
identified [Allen] in a deposition." (*Id.* (names abbreviated)). Instead, he
thought that Washington "identified [Allen] when he came into the courtroom
and saw him." (*Id.*).

Mr. Collins also addressed the considerations that shaped his decision
not to call Mr. Weed as a rebuttal witness and not to bring up Mr. Weed's email
in his impeachment of Washington:[12]

Q      . . . Did you put Mr. Weed on the stand about this email?

A      Of course not.

Q      Could you?

---

[12] It is undisputed that Mr. Collins questioned Washington about his written
and oral statements to Officer Brownfield while he was being treated at the hospital
on the night of the incident. (Doc. 12-6 at 81, 84–86). His one-page, somewhat
illegible, written statement did not seem to identify Allen as the shooter, but he
testified he verbally identified Allen as the shooter during the interview. (Doc. 12-6
at 81, 84–86, 88; Doc. 12-22 at 1–2 (stating, *inter alia*, "They was [sic] hollering
Daphedron Allen did it").)

A       No. I mean, I wouldn't have done that under -- maybe I should have, but I think that would have been done in a post-conviction proceeding, a [Rule] 3.850 [proceeding] or something. I mean, yeah, technically you're right. I could have stopped the trial and made it a bigger issue at that time and use[d] the email. The problem was . . . I would have expected Mr. Weed to say, wow, I didn't know he was going to say that . . . because there's no evidence that I had that Mr. Weed had anything to do with [Mr. Washington] remembering at that point it was Mr. Allen. And the truth of it is . . . he might have had an epiphany and all of [a] sudden decided he could now identify him, and I don't know what to do about it. . . . These are tough decisions. I've had over 500 jury trials in my career.

Q       . . . [W]hat's your understanding of the law as to whether you could have called Mr. Weed as a rebuttal witness?

A       I don't think -- I think, short of a mistrial or something [to] that effect -- and the judge presiding over the case, if I remember, was Judge Decker. . . . [H]e's a very fair judge. . . . [E]ven him, I don't believe, would've allowed me to stop the trial and take their lead attorney and put him under deposition for a question I had about the facts of the evidence, because I had no proof, other than that email that Mr. Weed knew what he was going to say. Mr. Weed's description in that email almost told me he was definitely going to identify him but [sic] didn't. It told me everything but he's going to say his name. Now, how it went from there to him saying his name, I don't know if I can attribute that to Mr. Weed. . . . [W]hat you're basically saying is he's suborning perjury, in my opinion, if he's saying or telling somebody what to say. And you don't go there unless you have, in my opinion, heavy[,] irrefutable, [ir]rebuttable evidence. . . .

Q       Tell me how powerful it would [have] be[en] if you [had] called the very same state attorney that put Mr. Washington on the stand and had him read this email that Washington --

A       That would have been a good idea, I didn't think of something like that. . . . But I didn't think of that. . . . Because in a trial, you're distracted, and my main thought was to impeach Mr.

39

Washington with everything else I could think of. But who was I going to call? . . . . I would have called Mr. Washington back. . . . [A]nd how I'm going to call Mr. Washington to comment on hearsay, I don't know what hearsay exception it would be. I said at first it was [a] very good idea, but my gut tells me, but [sic] I'm trying to find the legal way to make that happen. If you can tell me that, I'll agree with you. . . . .

Q      . . . [W]hat would prohibit you from calling Mr. Weed as a rebuttal witness to impeach what Washington told him?

A      Okay. First of all, my experience of trying cases with Mr. Weed, that would have been very, very risky material in that, Mr. Weed would have explained it in a way that it would have given credit to both Mr. Washington and himself[,] and ma[d]e me look foolish, because Mr. Weed is a very, very experienced attorney. . . . Legally, while it's relevant, . . . we're going to take the attorney who's trying the case and make him become a witness, [which] might have caused a mistrial, I don't know. He's going to be testifying about something he said, which is self-serving hearsay . . . . So it's not a statement against interest, and it's his own words, so that's hearsay but it's self-serving. . . . See, he hadn't testified, so I don't know what he could really testify to around [sic] hearsay exception. And even if he had, it probably wouldn't have been good testimony for me. . . . But to use Mr. Weed . . . as a witness in front of the jury? No. No, you're not going to get enough out of that in my opinion that's going to be worth trying that . . . . My professional judgment is, I wouldn't have attempted that at all.

(Doc. 12-21 at 86–88, 90–92, 95). Considering the record in this case, particularly the above-cited testimony, Allen has not shown that his trial counsel was deficient for failing to depose Washington and to impeach him with his prior inconsistent statement to Mr. Weed, or for failing to call Mr. Weed as a rebuttal witness.

On a final note, Allen argues in his Reply that the State attempts to refute his ineffective assistance claim in Ground Four by arguing that Mr. Weed's email must have been based on a misunderstanding of what Washington was trying to communicate to him the entire time. (Doc. 16 at 9). Indeed, the record supports Mr. Weed's initial misunderstanding of Washington's identification testimony. On direct examination, Mr. Weed testified that he "totally misunderstood" what Washington was trying to tell him all along about the shooter's identity. (Doc. 12-21 at 12). Mr. Weed stated:

> Washington had said all before that he could identify Allen, and in my conversations with him, both the telephone conversation and before, he kept saying, like, I could identify him. And when it turned out at trial, I totally misunderstood him, and . . . it became clear once he testified. . . . He always said that he could identify him, and I was always misunderstanding how he could identify him. But he always said, I can identify him . . . . Now [at] trial he said . . . he could see his face and I think that . . . kind of clarified for me, like, oh that's why you could identify him.[13]

---

13 For context, Washington testified at trial, in relevant part, as follows:

A Yeah, I seen [sic] his face. So, . . . after I hollered and said, . . . he's shooting, he's shooting, . . . that's when he ran back into the bushes. . . .
Q All right. When you saw his face, did you see the gun?
A No, I didn't see no gun. . . . I didn't see the gun, I just seen [sic] his face because [of] how fast it happened and I was already looking across . . . through the truck . . . towards the person.
Q I see. Okay. And the person that you saw in the bushes, or I guess at first outside the bushes, but jumped back in the bushes, do you see that person in the courtroom?
A Yes, sir.

(Doc. 12-6 at 70–71, 78; *see also id.* at 85, 92–94).

(*Id.* at 12, 15 (names abbreviated)).

On cross-examination, Mr. Weed elaborated:

Q    Was there a point in time [at] trial that it clicked with you as to what . . . Washington had been trying to say about [Allen] in his previous conversations with you?

A    Yes.

Q    Can you explain that to the Court?

A    Well, . . . in that first conversation, Washington . . . mentioned [it] in passing, . . . [by saying,] Yeah, [] I [have] seen him. And I was like, Whoa, you [have] seen him? . . . . [A]nd he's like, Yeah, I've seen him, . . . I can recognize him when I see him. He was . . . going on and on about that, and I remember saying, like, All right, whoa, whoa, back up; so was he in the bushes whenever he was shooting? He's like, Yeah, he was in the bushes. . . . . And then I said . . . , Did you see him while he was in the bushes? And he was like, . . . I couldn't see his face, but I could see him in the bushes while he was shooting. . . . So[,] I was thinking, all right, so [w]hat you saw was a figure in the bushes that you recognized? Well, at trial[,] he says he saw the face, and I remember[,] I even asked him . . . , What are you talking about? . . . [H]e said, Well, he stepped out of the bushes. . . . . And then finally it kind of clicked with me . . . , all right, now I understand what he was trying to say this whole time.

(*Id.* at 27–29 (names abbreviated)).

Then, on redirect, Mr. Weed explained:

[H]e wasn't making sense to me in that conversation, . . . and we were really talking past each other, because he kept saying, like, I know it was Allen. And I was like, Could you see him in the bushes? And he was like, No, I couldn't see him in the bushes. So I kept thinking, well, so basically, you recognize him from the shape, . . . but he didn't say that. . . . [W]hat he kept saying was, I didn't see his face in the bushes, but I seen [sic] him, I seen [sic]

> him, . . . I know him, I know him, that kind of thing. . . . I put in
> the email what I understood him trying to convey to me. . . . I
> remember trying to get ahold of him, but I didn't get a chance to
> talk to him except for once, I believe, before he testified, and I can't
> remember if it was jury selection or the day he testified.

(*Id.* at 55–56).

Based on the foregoing, the record sufficiently establishes Mr. Weed's

initial misunderstanding of what Washington was trying to tell him about the

shooter's identity, which was reflected in his email to Mr. Collins. Therefore,

even if the state court's adjudication is not entitled to deference, the claim must

still be denied on the merits. Accordingly, Ground Four is denied.

### E.    Ground Five

In Ground Five, Allen alleges a claim of cumulative error. (Doc. 5 at 50–

51; *see also* Doc. 16 at 16). He raised this claim as ground six in his Rule 3.850

motion. (Doc. 12-19 at 25–26). The trial court denied the claim as follows:

> [Allen] asserts the cumulative effect of counsel's ineffective
> assistance as alleged in Grounds One, Two, Four[,] and Five,
> deprived him of due process and a fair trial. [Allen] requests his
> conviction and sentence be vacated and a new trial held.
> . . .
> Where the alleged errors urged for consideration in a cumulative
> error analysis are individually "either procedurally barred or
> without merit, the claim of cumulative error also necessarily fails."
> *See Hurst v. State*, 18 So. 3d 975, 1015 (Fla. 2009) (quoting *Israel
> v. State*, 985 So. 2d 510, 520 (Fla. 2008) (quoting *Parker v. State*,
> 904 So. 2d 370, 380 (Fla. 2005); *see also Salazar v. State*, 188 So.
> 3d 799, 818 (Fla. 2016) (quoting *Hurst*, 18 So. 3d at 1015). Here,
> [Allen] has not established counsel's performance was deficient on

43

any of the grounds raised. Accordingly, he is not entitled to relief
on Ground Six.

(Doc. 12-24 at 11). The First DCA per curiam affirmed the trial court's denial

without a written opinion.  (Doc. 12-29).

The Court addresses this claim in accordance with the deferential

standard for federal court review of state court adjudications. Upon thorough

review of the record and the applicable law, the Court finds that the state

court's decision to deny Allen's claim was neither contrary to nor an

unreasonable application of federal law, and it was not based on an

unreasonable determination of the facts given the evidence presented to the

state court. *See* 28 U.S.C. § 2254(d).

Nevertheless, even if the state court's adjudication is not entitled to

deference, this claim must still be denied for the reasons that follow. As the

United States Supreme Court has not yet held that distinct constitutional

claims can be cumulated to grant habeas relief, the judgment of the state court

cannot contravene § 2254(d). *See, e.g. Wright v. Van Patten*, 552 U.S. 120, 126

(2008) ("Because our cases give no clear answer to the question presented . . . ,

it cannot be said that the state court unreasonabl[y] appli[ed] clearly

established Federal law." (internal quotation marks and citations omitted)).

However, even if the claim of cumulative error is cognizable for federal habeas

review, it must still be denied because each individual claim that Allen raises

44

is "either meritless, procedurally barred, or [does] not meet the *Strickland* standard for ineffective assistance of counsel." *Schoenwetter v. State*, 46 So. 3d 535, 562 (Fla. 2010); *see also Morris v. Sec'y, Dep't of Corrs.*, 677 F.3d 1117, 1132 n.3 (11th Cir. 2012) ("We need not determine today whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law. For our purposes, it is enough to say that Morris's cumulative error claim clearly fails in light of the absence of any individual errors to accumulate."). Therefore, Ground Five is denied.

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1.      The Amended Petition (Doc. 5) is **DENIED** and this action is **DISMISSED WITH PREJUDICE**.

2.      The Clerk of the Court shall enter judgment dismissing this action with prejudice, terminate any pending motions, and close the file.

3.      If Petitioner appeals this Order, the Court denies a certificate of appealability.[14] Because the Court has determined that a certificate of

---

[14] The court should issue a certificate of appealability only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke,* 542 U.S. 274, 282 (2004) (quoting *Slack v.*

appealability is not warranted, the Clerk of the Court shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida, this 2nd day of January, 2026.

_____
JORDAN E. PRATT
UNITED STATES DISTRICT JUDGE

Jax-11 12/15
c:
Counsel of Record

---

*McDaniel,* 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" *Miller–El v. Cockrell,* 537 U.S. 322, 335–36 (2003) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)). Upon due consideration of the record as a whole, this Court denies a certificate of appealability.